# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| **BRYAN GRAY,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:20-cv-791-SDJ-KPJ** |
| | § | |
| **WINCO FOODS, LLC, ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Pending before the Court is Defendants WinCo Foods, LLC ("WinCo"), Carly Leibengood[1] ("Leibengood") and Bryan Miller's ("Miller") (collectively, "Defendants") Motion for Summary Judgment (the "Motion") (Dkt. 35). The Motion is fully briefed. *See* Dkts. 39, 43, 47. The Court held oral argument on the Motion on March 23, 2022. *See* Dkt. 57. Having considered the briefing, the summary judgment evidence, and the applicable law, the Court recommends the Motion (Dkt. 35) be **GRANTED**.

## I.     BACKGROUND

WinCo operates grocery stores and related facilities in multiple states including Texas. *See* Dkt. 11 at 1–2. This lawsuit stems from the termination of Plaintiff's employment as a store manager at a WinCo grocery store located in North Richland Hills, Texas ("Store 126"). *See id.* at 2–4. In his amended complaint ("First Amended Complaint"), Plaintiff asserts claims under the Americans with Disabilities Act (the "ADA") and the Texas Labor Code (the "TLC") against

---

[1] This particular Defendant's last name is spelled differently in the record, appearing as both Leiberngood and Leibengood. The Court assumes Leibengood is the correct spelling based on her WinCo email address and signature line. *See* Dkt. 35-3 at 34–35.

WinCo, and claims under the Family and Medical Leave Act ("FMLA") against WinCo and two WinCo employees, Leibengood and Miller, both of whom were involved in Plaintiff's termination.[2]

Except as otherwise noted, the following facts are undisputed. At the summary judgment stage, the Court views the facts and all reasonable inferences therefrom in the light most favorable to Plaintiff, as the non-moving party. *See Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399 (5th Cir. 2021).

### A. Relevant Factual Background

Plaintiff was eighteen years old when he began working for WinCo as a part-time employee in July 2003. *See* Pl.'s Dep. (Dkt. 35-1) at 14–15.[3] In 2009, Plaintiff became a full-time employee. *Id.* at 15. Over the years, Plaintiff worked in various positions at WinCo stores across multiple states. *Id.* at 14–19. In 2015, Plaintiff transferred to a WinCo store in Lewisville, Texas, where he worked as an assistant store manager. *Id.* at 18–19. In April 2017, WinCo promoted Plaintiff to store manager and placed him at Store 126 in North Richland Hills, Texas. *Id.* at 20.

#### 1. WinCo's Policies and Procedures

In his role as store manager, Plaintiff testified he was responsible for ensuring that all store personnel complied with WinCo's company policies, any collective bargaining agreements in place, as well as federal and state law. *See* Dkt. 35-1 at 23–24. Three specific WinCo policies are relevant in this case: (1) Family and Medical Leave Policy (the "FMLA Policy"); (2) Reasonable Workplace Accommodations Policy (the "Workplace Accommodations Policy"); and (3) COVID-

---

[2] *See* Dkt. 39 at 20 n.4 (Plaintiff stating that his FMLA claims are against WinCo and the individual defendants); *id.* at 49 (stating that his ADA and TLC claims are brought only against WinCo); *see* Dkt. 11 at 5 (Plaintiff's First Amended Complaint wherein he alleged that "Defendants violated the FMLA" and "Win[C]o subjected Plaintiff . . . to retaliation under the ADA and TLC").

[3] For ease of reference, the Court will cite to the CM/ECF docket and page number rather than any internal pagination in the parties' exhibits.

19 Emergency Paid Leave Benefit Policy (the "COVID-19 Leave Policy"). *See* Dkt. 35-1 at 121–38; Dkt. 39-9 at 14–19.

WinCo's FMLA Policy specified that a third-party vendor, FMLASource, handled and administered FMLA leave requests for all WinCo employees. Dkt. 35-1 at 121. The FMLA Policy noted that other types of leave requests—namely, leave as a reasonable accommodation, personal leaves of absence, and municipal sick pay/state leave laws—were administered internally by WinCo—not by FMLASource. *Id.* Plaintiff received training on the FMLA Policy, and testified that his role as store manager was limited to ensuring that employees knew of the FMLA Policy and who to contact if they needed FMLA leave and "relaying information that [he] received from human resources." *Id.* at 26–28. Other than directing employees to FMLASource, Plaintiff admitted that he did not play any role in administering or deciding FMLA leave requests. *Id.* at 29.

WinCo's Workplace Accommodations Policy instructed employees seeking a reasonable workplace accommodation to complete a reasonable workplace accommodation request form. *See* Dkt. 35-1 at 135–36, 139. Plaintiff testified that he believed the only way he could be made aware of a potential request for workplace accommodation was if an individual employee submitted a request form. *Id.* at 32–33, 35–36. As for submission of doctor's notes with a request for accommodations, the Workplace Accommodations Policy specified:

> **Doctor's Notes**: The employee is required to provide a physician's note(s) detailing limitations/restrictions within the workplace. *A doctor's note is not required for restrictions less than 2 weeks in duration or for obvious conditions.* If the management receives restrictions directly from HR, a doctor's note is not required as it is likely on file. Please verify with HR and record properly within the ADA file.

*Id.* at 139 (emphasis added). Upon receipt of a request for accommodations, store management or human resources was required to "engage in an interactive process with the employee to identify potential workplace accommodations." *Id.* at 136; *see also* Dkt. 35-1 at 32 (Plaintiff's testimony

that upon receiving the request form, he was responsible for holding an IP meeting and discussing the parameters of the request). The Workplace Accommodations Policy further specified that if "an on-the-job accommodation cannot be found[,] the employee's manager must contact Human Resources" because "[o]nly HR is authorized to deny an accommodation." *Id.* at 139 (emphasis removed).

WinCo's COVID-19 Leave Policy, which was adopted in April 2020, entitled eligible employees to "take a paid leave of absence, up to a maximum of two weeks of paid leave in addition to other paid leave (i.e. sick, vacation)" subject to certain terms and conditions. *See* Dkt. 39-9 at 14 (emphasis removed).

### 2. Plaintiff Received a Written Warning in September 2018

In September 2018, approximately seventeen months after Plaintiff became store manager at Store 126, WinCo issued Plaintiff a written warning (the "Written Warning") after two investigations revealed that Plaintiff had not "been consistently enforcing attendance related policies and procedures." *See* Dkt. 35-2 at 2. In the first investigation, conducted in December 2017, WinCo found "inconsistencies in [Plaintiff's] administration of the weekly Schedule vs. Worked report, which had the potential for some employees to be held accountable to the attendance policy when others were not." *Id.* In the second investigation, conducted in August 2018, WinCo found Plaintiff was "not consistently administering and/or enforcing the sixth hour lunch punch process for [his] hourly employees." *Id.* at 2–3. When this issue was brought to Plaintiff's attention, he indicated that he had asked the assistant store managers ("ASMs") at Store 126 to monitor lunch punch violations.[4] *Id.* at 3. WinCo determined, however, that Plaintiff, as the

---

[4] According to WinCo, a sixth hour lunch punch violation occurs when an hourly employee fails to take a meal break before the sixth hour of his/her shift. *See* Dkt. 35 at 13; *see also* Dkt. 35-1 at 42 (Plaintiff's deposition testimony that "[d]epending on the length of your shift, you needed to take your lunch by the fifth or sixth hour of work").

store manager, was ultimately responsible for ensuring that "policies and procedures are consistently enforced even if it means auditing the work of [his] ASMs." *Id.* WinCo therefore issued the Written Warning to Plaintiff for violating "WinCo Company Personnel Policies, Section I. Work Performance ¶ 2., 'Be productive, do quality work and follow the directives of supervision.'" *Id.* WinCo directed Plaintiff to "ensure immediate and sustained compliance with all administrative functions" including "scheduled versus worked deviations, and discipline adherence related to the sixth hour lunch punch audit." *Id.*

### 3. Store 126 Employees Request Leave due to COVID-19 Pandemic

At the onset of the COVID-19 pandemic in early 2020, WinCo CEO Grant Haag ("Haag") sent a notice to all employees informing them of WinCo's intention to keep "stores open and serving our communities in this unprecedented time." *See* Dkt. 35-2 at 8. Haag advised employees that their health and safety remained WinCo's top concern and that while it was monitoring the situation closely, WinCo was recommending for now that employees follow "CDC and WinCo's internal policies . . . on work absences should [an employee] feel sick." *Id.* Haag stated in the notice that managers would be handling "sick leave on an individual case-by-case basis." *Id.*

Store managers, including Plaintiff, received a separate email from Haag informing them of the above notice. *See* Dkt. 35-2 at 7. With regard to WinCo's employee attendance policy, Haag's email asked store managers to "be flexible and consider each situation on a case-by-case basis, making the best decision you can for business continuity at the local level." *Id.* at 8. Haag's email also included a list of "talking points" that he wanted store managers to consider during their communications with store employees. *Id.* at 7, 10. In relevant part, the talking points directed store managers to be "flexible and creative in meeting the needs of their employee[s]" while "keep[ing] the store as staffed as possible." *Id.* at 10. The talking points stated that WinCo

authorized the use of "any available paid sick or vacation time to: support employees and their families that are ill with the [COVID-19] virus [and] . . . for circumstances directly surrounding the virus such as school and daycare closures." *Id.* The talking points additionally encouraged store managers to maximize employee availability by offering alternative work schedules. *Id.* at 11.

Upon receiving Haag's email, Plaintiff testified that he held a meeting with individual department managers at Store 126 to convey that if they "did not feel safe at work[,] . . . they had the ability to take a leave." *See* Dkt. 35-1 at 52. According to Plaintiff, this was the "theme of the meeting." *Id.* In his deposition, Plaintiff testified he told employees that "if they had fears and they weren't comfortable expressing them in a meeting-type setting[,] that they could come to [him] one-on-one." *Id.* at 52–53. He also said, "if you or your family are afraid of getting sick, then we can talk about a leave, taking a leave." *Id.* at 53. Plaintiff testified he explained to the department managers that he could not promise "paid leave, but you can take the time off unpaid if that's what it takes for you to feel safer." *Id.* at 54. Plaintiff directed the department managers to have their own conversations with store employees in their respective departments, and to let the employees know they had "the same ability to take a leave that [management] do[es]." *Id.* at 58.

Following his meeting with department managers, Plaintiff had a one-on-one meeting with Shelby Glass ("Glass"), produce department manager at Store 126, to discuss her concerns about working during the pandemic. *Id.* at 56–57. According to Plaintiff, Glass expressed that she did not feel safe working around so many people. *Id.* at 57. Plaintiff testified that Store 126 was initially able to address Glass's concern by temporarily blocking off aisles where a produce department employee was working so that no customers could shop that part of the produce section at that time. *Id.* Eventually, however, Plaintiff learned that multiple produce department employees, including Glass, still wanted to take leave. *Id.* at 47–48. Plaintiff therefore contacted

Matt Bryant, who was the produce supervisor for WinCo's Texas and Oklahoma Division, to request help in the produce department. Plaintiff told Bryant he had multiple employees, including Glass, who wanted to take leave as "they did not feel safe [working] because they were concerned about getting COVID." *Id.* at 50; *see also* Shelby Glass Dep. (Dkt. 39-8) at 3.

Plaintiff testified he believed Bryant, in turn, contacted Miller, one of the named Defendants in this case, who at the time was WinCo's district manager for the Texas and Oklahoma division. *See* Dkt. 35-1 at 49–50. Miller then called Plaintiff to discuss the situation. When Plaintiff reiterated to Miller what he had told Bryant, i.e., that multiple produce department employees were interested in taking leave, Miller asked Plaintiff, "Who is steering that ship?" *Id.* at 60. Plaintiff felt Miller was "abrasive in his response and was clearly unpleased with the[] [employees] wanting to [take] leave." *Id.* at 48. According to Plaintiff, Miller did not want the employees to take leave. *Id.* at 62.

Concerned about Miller's reaction during the phone call, Plaintiff emailed Jim Reilly ("Reilly"), WinCo's vice president of human resources, on March 21, 2020, asking him to call Plaintiff to discuss "some concerns about coronavirus." *Id.* at 61, 74; *see also* Dkt. 35-2 at 6. Reilly called Plaintiff that same day. *See* Dkt. 35-1 at 61. Plaintiff told Reilly that he "didn't appreciate the way [Miller] called [him] and [he] didn't feel that [Miller] was taking [employee] concerns and [employee] fears seriously." *Id.* at 62. Plaintiff relayed that he felt that it was more important to Miller to "keep employees in the store than to reduce the[ir] risk of getting sick." *Id.* Plaintiff expressed concerns regarding his employees getting sick, relayed that employees were "scared of getting sick," and asked Reilly what WinCo planned to do in terms of protecting store employees. *Id.* at 62, 64, 66, 73, 80. Plaintiff testified that Reilly said he understood Plaintiff's concerns. *Id.* at 64. Reilly told Plaintiff that WinCo was considering options like hazard pay, bonuses, and more

PTO for store personnel. *Id.* at 106. Plaintiff additionally raised concerns that he had for himself and his family, and Reilly responded by encouraging Plaintiff to do whatever was best for his family, and to take leave if he felt it was necessary. *Id.* at 64–66, 73, 80 ("I remember telling him that I was afraid that my employees were going to get sick, that their families were going to get sick. And that I was concerned we weren't taking it, taking the pandemic, serious enough and that I didn't want the blood on my hands.").

Plaintiff testified that after he spoke with Reilly, Miller's subsequent communications with Plaintiff were "supportive" in nature, with Miller telling Plaintiff to "do what you need to do." *Id.* at 86; *accord id.* at 87 ("[H]e seemed supportive of everything after that initial call and me calling Jim Reilly. He was supportive of everybody."). In his deposition, Miller testified that he was not aware Plaintiff had spoken with Reilly, and that Reilly never told Miller about Plaintiff's phone call. *See* Dkt. 35-4 at 7, 8, 10.

Plaintiff testified the employees about whom he spoke to Miller and Reilly were not seeking leave under the FMLA or the ADA; in fact, the FMLA and ADA did not come up at all during Plaintiff's phone conversations with Miller or Reilly. Dkt. 35-1 at 66; *id.* at 64 ("They did not ask for ADA or FMLA leave . . . We [Miller and I] did not discuss ADA leave or FMLA."). Plaintiff also testified that he was not aware if any of the employees seeking leave had a disability. *See id.* at 50–51. Ultimately, three produce department employees took personal leaves of absence during the pandemic. *Id.* at 51; *see also* Dkt. 39-8 at 4 (Glass testifying in her deposition that she took a personal leave of absence shortly after the pandemic began).

### 4. Failure to Open Store 126's Bulk Food Section by July 1, 2020

Due to the COVID-19 pandemic, WinCo initially closed bulk food sections in grocery stores, including Store 126.[5] In June 2020, WinCo decided to resume limited bulk food operations. *See* Dkt. 35-2 at 27–28. On June 23, 2020, Miller sent an email to Plaintiff and other store managers instructing them to re-open the bulk barrels in their respective stores by July 1, 2020, so that WinCo could "capture the 1st of the month sales." *Id.* at 27. On July 1, 2020, Miller visited Store 126 and saw that the bulk foods department had not been re-opened. *See* Dkt. 35-2 at 14.

Plaintiff testified that Miller asked him to immediately reopen the bulk foods department. *See* Dkt. 35-1 at 71. Plaintiff stated that he pulled store employees from other areas to assist in reopening the bulk foods department. *Id.* According to Plaintiff, the department reopened within one day of Miller's visit. *Id.* at 71–72.

Plaintiff admitted in his deposition that he did not reopen the bulk foods department by the July 1st deadline, but testified that the department was under-staffed, and he had prioritized other tasks over reopening the department such as keeping the store clean, staffing cash registers, and stocking shelves. *See* Dkt. 35-1 at 67–68; *id.* at 68 ("Bulk foods does a very small percentage of our business, and I felt that maintaining a produce department or sales space was a greater contributor to our sales than bulk foods."). Plaintiff conceded that he did not contact Miller prior to the July 1st deadline to discuss these other priorities or the staffing issues he was encountering in the bulk food department. *Id.* at 68–69. Miller testified that he found Plaintiff's failure to reopen the bulk foods department by the July 1st deadline to be insubordination on Plaintiff's part under

---

[5] Although the parties generally agree that WinCo's bulk food departments were closed due to the pandemic, they dispute the reasons behind the closure. Relying on deposition testimony from various employees that WinCo stores encountered staffing issues due to the pandemic, Plaintiff asserts in his briefing that the "delay in reopening [bulk food departments] occurred during a period of persistent understaffing . . . on account of the COVID-19 pandemic." *See* Dkt. 39 at 17. Leibengood, however, testified that the "bulk barrels/bins were originally closed due to COVID concerns, not staffing" and that the "reopening of the bins occurred due to new directives with additional safety precautions regarding the bins." *See* Dkt. 43-4 at 3. This dispute has no bearing on the Court's analysis.

WinCo's gross misconduct personnel policy. *See* Dkt. 39-2 at 6. One week after his visit to Store 126, on July 7, 2020, Miller sent an email to Leibengood, a named Defendant in this case who at the time was a regional human resources specialist, expressing his concerns regarding Plaintiff's "non-compliance" in timely reopening the bulk foods barrels. *See* Dkt. 35-2 at 14.

**5. Investigation Regarding Plaintiff's Alleged Failure to Accommodate Two Store Employees**

Jennifer Kincaid ("Kincaid") was a store personnel clerk at Store 126 during the early stages of the COVID-19 pandemic. *See* Dkt. 47-1 (Kincaid Dep.) at 6. In her deposition, Kincaid testified that in mid-March 2020, she contacted Plaintiff to request an accommodation because she was experiencing back pain while working at the cash register for long periods of time. *Id.* at 30. According to Kincaid's testimony, Plaintiff responded by telling her she needed a doctor's note before he would hold an interactive process ("IP") meeting. *Id.* ("[H]e said he would need a doctor's note before he could accommodate.").

Upon receiving Kincaid's request for an accommodation, Plaintiff emailed Leibengood in human resources for guidance on the request. *See* Dkt. 35-3 at 6–7. Plaintiff specifically asked Leibengood in the email whether he needed to ask Kincaid to provide a doctor's note:

> . . . I received Jennifer's [Kincaid] reasonable accommodation request which I've attached. She is requesting to not lift/push/pull 10 lbs and has not provided a DR. note recommending this. She said she cannot stand for extended periods of time which is a broad request and wants a stool. Right now we really need her in a checkstand, put her in SCO [self-checkout]? Is this asking too much? Do I tell her she needs to bring in a DR. note? Please advise.

*Id.* at 7. Leibengood responded to Plaintiff's email, advising him to "follow your normal IP Meeting protocol," which she stated would "answer quite a few of the questions" Plaintiff raised in his email. *Id.* at 6. In her email, Leibengood also told Plaintiff to let Kincaid know that:

> we'll be able to accommodate her for up to two weeks, but we do need some supporting documentation from a doctor. That doesn't mean in 2 weeks we stop

10

accommodating her necessarily. I imagine it's quite difficult to get into the doctor
right now and she may not get an appointment for 3-4 weeks. However, she does
need to keep in communication with us on when she'll be able to get that
documentation to us. It won't just be open ended.

*Id.*

Kincaid testified that she provided a doctor's note to Plaintiff because he told her "he
wouldn't accommodate without a doctor's note." Dkt. 47-1 at 17. But even after submitting the
doctor's note, Kincaid testified that she had to ask Plaintiff "several times to have an IP meeting."
*Id.* While Kincaid waited for her IP meeting, she testified she had to continue cashiering while in
pain. *Id.* at 42. Kincaid eventually had an IP meeting, which resulted in an accommodation that
removed Kincaid from cashiering duties altogether. *Id.* at 22–23. Kincaid reported Plaintiff's
handling of her accommodation request to WinCo's human resources department. *See* Dkt. 35-3
at 4–5, 9; *see also* Dkt. 47-1 at 22.

In April 2020, Deandre "Draya" Scott ("Scott"), a cashier at Store 126, approached
Plaintiff to request an accommodation due to back pain. *See* Dkt. 43-7 (Scott Dep.) at 8 ("I asked
[Plaintiff] . . . . 'Hey, Bryan, is there any way that I can get shorter hours, or any kind of way that
I can sit down for a little bit before checking or like while I am checking?"). Scott testified that
Plaintiff told her she needed a doctor's note before he would consider giving her an
accommodation. *Id.* at 2, 8. Scott described Plaintiff's tone as being very strong—a "no and I mean
no" tone that left her feeling as though her accommodation request was "unwelcome" and Plaintiff
"didn't care what [she] was trying to say." *Id.* at 9. Kincaid happened to be in Plaintiff's office
when the above interaction took place between Plaintiff and Scott. *See* Dkt. 47-1 at 23 ("[Scott]
mentioned she needed shorter shifts, and I think there is another accommodation, I can't recall, to
which he said, get me a doctor's note. We will set up an IP."). Kincaid testified that after Scott left
Plaintiff's office, she told Plaintiff WinCo policy allowed him to accommodate Scott for up to two

weeks without a doctor's note. *Id.* at 24, 34. Kincaid testified Plaintiff responded by saying "it's my store" and he did not have to accommodate Scott. *Id.*

Leibengood testified that Scott did not contact her or WinCo's HR Hotline to report Plaintiff's handling of Scott's request for an accommodation. *See* Dkt. 39-3 (Leibengood Dep.) at 7–8. Even though Scott did not do so, Kincaid notified human resources of the interaction she witnessed between Plaintiff and Scott. *See* Dkt. 35-3 at 4; Dkt. 43-7 at 3–4 (Scott's testimony that Kincaid called human resources to report Plaintiff's handling of her accommodation request). Kincaid testified she also reported to human resources that Plaintiff made comments that he would accommodate employees by placing them at self-checkout or door greeting because those duties were "slow and it encouraged them to get back to work [without accommodations] quicker." *See* Dkt. 47-1 at 24.

In his deposition testimony, Plaintiff disputed Kincaid and Scott's version of events regarding Scott's request. *See* Dkt. 35-1 at 66. He asserted that Kincaid and Scott falsely claimed that he failed to have an IP meeting or meet the accommodation requests made by Scott. *Id.*

Leibengood thereafter began an Investigation (the "Investigation") into Kincaid's allegations. *See* Dkt. 35-3 (WinCo's file of the Investigation); *see also* Dkt. 35-6 at 7–8 (Leibengood's testimony regarding the Investigation process). Leibengood testified that she spoke with Kincaid, Plaintiff, and Scott—in that order—during the course of the Investigation. *Id.* at 7. Leibengood testified that Plaintiff admitted to her that Plaintiff had "a conversation regarding an accommodation" with Scott, but denied asking Scott for a doctor's note. *Id.* at 7, 17. Kincaid and Scott both reported that Plaintiff asked for a doctor's note. *Id.* at 17. Leibengood reviewed security video footage, which she testified confirmed that Plaintiff, Scott, and Kincaid all had an encounter on April 17, 2020, in Plaintiff's office. *Id.* at 13 (testifying that the video "confirmed and

corroborated Jennifer's story that th[e] meeting happened"). Leibengood testified that she also reviewed entries in the AS400, which was WinCo's internal system for documenting the interactive process. *See id.* at 8–11. The AS400 showed Plaintiff held an IP meeting with Kincaid in connection with her own request for an accommodation. *Id.* at 9. But Leibengood was unable to find anything in the AS400 in terms of an IP meeting having been held for Scott or of Scott receiving an accommodation. *Id.* at 10–11. Leibengood testified that Scott's accommodation request was not documented at all in the AS400. *Id.* at 10–11.

Leibengood subsequently asked Plaintiff to hold an IP meeting with Scott. *Id.* at 11. Scott testified that she was called into the office to speak with "corporate" who informed her that Kincaid had filed a complaint about the situation. Dkt. 43-7 at 6. Scott was told that she would receive an IP meeting in connection with her accommodation request. *Id.* Scott's IP meeting took place on June 12, 2020, *see* Dkt. 35-6 at 7, after which management accommodated Scott by making changes to her work schedule. *See* Dkt. 43-7 at 6.

Upon concluding the Investigation, Leibengood made the following findings in her Investigation Report (the "Investigation Report"):

> [Plaintiff] admitted to knowing that [Scott] spoke to him about needing an accommodation. He did not complete the IP Meeting in a timely manner causing [Scott] to not receive the accommodation she requested. [Plaintiff] also admitted to knowing that he could accommodate an employee temporarily before requiring documentation.

> [Plaintiff] knowingly did not conduct an IP Meeting and did not accommodate an employee for over a month. I could not substantiate any of the comments that [Kincaid] stated that [Plaintiff] made in regards to employee accommodations or light duty.

Dkt. 35-3 at 3.

### 6.   Plaintiff's Termination

In early July 2020, Leibengood shared the results of the Investigation with Miller, and recommended that WinCo terminate Plaintiff's employment. *See* Dkt. 35-4 at 17–18, 24 (Miller's testimony regarding the Investigation results being shared with him); *see also* Dkt. 35-6 at 15 (Leibengood's testimony that "the primary reason for [Plaintiff's] termination was the lack of accommodation [for Scott]. So the lack of the IP meeting [with Scott at the time of her initial request]. But also the request of documentation [i.e., the doctor's note] for [Scott.]"). In addition to the results of the Investigation, Miller and Leibengood discussed other reasons they believed supported termination of Plaintiff's employment. *See* Dkt. 35-2 at 14 (July 7, 2020 email from Miller to Leibengood, wherein Miller raised Plaintiff's failure to open the bulk food department by July 1, 2020, as an additional basis for termination); *see also* Dkt. 35-6 at 15 (Leibengood's testimony that the other reason for the termination was Plaintiff's work performance due to his failure to follow directives regarding the bulk barrels).

Miller testified he made the decision to terminate Plaintiff's employment by July 10, 2020. *See* Dkt. 35-4 at 19, 21; *see also* Dkt. 35-6 at 14 (Leibengood's testimony that the decision to terminate Plaintiff was made in "early July"). Miller was, however, leaving for vacation the following day and returning on July 18, 2020. *Id.* at 22. Miller was also aware that Plaintiff was taking vacation time the following week, from July 19, 2020, through July 26, 2020. *Id.* Miller testified that, although the decision to terminate Plaintiff was made prior to his vacation, he planned to terminate Plaintiff on the day Plaintiff was scheduled to return from vacation—Monday, July 27, 2020. *Id.* at 22–23.

On July 24, 2020, the Friday before Plaintiff was scheduled to return to work from vacation, Leibengood and Miller exchanged emails regarding the plan to terminate Plaintiff's

employment upon Plaintiff's return. *See* Dkt. 35-3 at 34–35. On that day, Leibengood emailed a draft of Plaintiff's Notice of Separation (the "Draft Termination Letter") to Miller for his review, and told Miller she was going to contact "payroll to confirm [Plaintiff's] pay through the end of next week [August 1, 2020]." *Id.* The Draft Termination Letter, dated July 24, 2020, stated that Plaintiff's termination was effective immediately with pay "for the remainder of th[e] week (ending 08/1/2020)." *Id.* at 36–37. Miller reviewed the Draft Termination Letter and emailed suggested edits to Leibengood. *Id.* at 34. Leibengood made the edits, and her final email to Miller on July 24, 2020, was a checklist of items that needed to be covered at Plaintiff's termination meeting, which they planned to hold the following Monday, July 27, 2020. *Id.* In that email, Leibengood stated:

> . . . Here's the updated copy [of the termination letter]. Hopefully, we'll have any update from Payroll by Monday. Prior to the meeting, you'll need to enter the term[ination] in the AS400. Should be under XVI. 3 and I would recommend using simple verbiage, "See confidential file."
>
> H's [sic] a checklist to help remind us everything we need on Monday:
>
> Reminders of things to cover at the term meeting
> - Collect keys, cellphone, radio, and any other co. equipment.
> - Change safe code.
> - If needed, allow him the option to come back at a later date to clean out office as long as we know when so LP can be present.
> - Do you want a SM present shortly after the term to cover the store and help handle EE questions and concerns?
> - Email IT immediately after term meeting to have all [Plaintiff's] systems accesses shut down.
> - We will want to let him know that he can return for purposes of shopping only and not to discuss any employment matters with any of our EEs and/or access any offices or confidential areas.

*Id.* at 34.

That weekend, on Sunday evening, Plaintiff informed Miller by text message that Plaintiff's wife had a fever and was going to get tested for COVID-19 the following morning, July

27, 2020, which as stated above, was supposed to be Plaintiff's first day back at work. *See* Dkt.

35-3 at 28. Miller responded, "Ok keep me posted. Thanks." *Id.* The following morning, Plaintiff

texted Miller to let him know that Plaintiff's wife's COVID-19 test "results could take 5-10 days."

*Id.* at 29. Miller responded:

> You will have to quarantine until she [Plaintiff's wife] gets her results back. Also,
> contact FMLA[Source] for any extended leave you have.

*Id.* Plaintiff responded: "Will do. . . ." *Id.* Miller did not hear from Plaintiff the rest of the week,

so the following week, on Tuesday August 4, 2020, Miller texted Plaintiff to ask if he had any

updates. *Id.* at 30. Plaintiff responded that he was still waiting for his wife's test results, but that

he, too, had gotten tested because he lost his sense of taste and smell. *Id.* at 30–31. Plaintiff stated

that he expected to have his results by the end of the week. *Id.* Eight days later, on August 12,

2020, Plaintiff texted Miller that he tested positive and was going to send an email to the COVID

team. *Id.* at 32. Miller responded by asking Plaintiff to copy Miller and Leibengood on the email

to the COVID team. *Id.* Aside from learning through their text exchange that Plaintiff had lost his

sense of taste of smell, Miller testified that he otherwise had no knowledge of Plaintiff's condition

or symptoms due to COVID-19. *See* Dkt. 35-4 at 13. Plaintiff later testified at his deposition that

his initial COVID-19 symptoms were a loss of taste and smell followed by nausea and fever for

"a couple days." Dkt. 35-1 at 114. After his fever was gone, Plaintiff no longer had symptoms. *Id.*

at 114–15. On August 17, 2020, Plaintiff texted Miller that he was ready to come back to work

because it was his third day without symptoms, to which Miller responded by asking Plaintiff to

report to work at Store 126 the following day. *Id.* at 33.

Upon reporting to work on August 18, 2020, Plaintiff's employment was terminated.

Plaintiff received a Notice of Separation (the "Termination Letter") dated August 18, 2020, and

signed by Miller. *See* Dkt. 35-3 at 41–42. The Termination Letter stated that Plaintiff had violated

WinCo's personnel policies for "Gross Misconduct [due to] . . . being insubordinate towards or being disrespectful towards customers, fellow employees, or management" and "Work Performance [due to] . . . [the failure to] be productive, do quality work and follow the directives of supervision." *Id.* at 41. The Termination Letter specifically gave three examples of Plaintiff's alleged conduct that violated these policies. *Id.*

The first was the Written Warning Plaintiff received in September 2018. *Id.* The second was "concerns regarding [Plaintiff's] performance and ability to follow directives" based on his failure to open the bulk foods department by July 1, 2020. *Id.* at 42. The third was described as Plaintiff being "inconsistent regarding Protected Leave and Accommodations related policies and procedures." *Id.* The Termination Letter explained:

> As you know, in June of 2020, Carly L. [Leibengood], RHRS discussed concerns brought forward by an employee via the HR Hotline with you. HR was made aware of inconsistencies in execution of the Interactive Process for Accommodations, which had the potential for some employees to be accommodated while others were not. Although this did not result in an employee claim of favoritism or discrimination, it had the potential to do so. Immediately following that discovery, HR recommended a remedy for which to rectify this situation.
>
> During further review, HR did find inconsistencies in execution of the Interactive Process for Accommodations. When this was brought to your attention during the investigation, you indicated that you did not know whether you or your Assistant Store Managers completed an IP meeting for an employee. You also admitted to knowing about the employee's request for an accommodation, as well as, full knowledge of WinCo's policies & procedures regarding ADA Accommodations. As the Store Manager, it is your responsibility to ensure these procedures and policies are consistently administered even if it means auditing the work of your ASMs.
>
> Bryan, your inconsistent administration of the Interactive Process could appear to be favoritism or even a form of discrimination. We have brought similar concerns regarding consistent application of policies and procedures to your attention and given you multiple opportunities to fix the problem, yet we continue to see significant gaps in proper administration. As we have discussed, this jeopardizes the Company from a legal standpoint and also has the potential to erode employee morale.

*Id.* at 41–42. The Termination Letter concluded by informing Plaintiff that his termination was effective immediately, and he would be paid for the remainder of the week. *Id.* at 42.

### 7.  Plaintiff's FMLA Leave Request[6]

It is undisputed that prior to his termination, Plaintiff did not submit a request for FMLA leave to FMLASource. *See* Dkt. 35-1 at 116. However, "within a few days" after his August 18, 2020 termination, Plaintiff submitted a FMLA leave request to FMLASource for the time period beginning on July 27, 2020, and ending on August 17, 2020. *See id.*; *see also* Dkt. 39-9 at 1, 5. FMLASource then sent a letter, dated August 19, 2020, to Plaintiff confirming that it received his request. *Id.* at 5. The letter stated that while Plaintiff was "eligible for relief under [the] FMLA," his leave request would not be considered unless Plaintiff submitted a medical certification form completed by his medical provider. *Id.* The Notice further provided that the leave request, if approved, would entitle Plaintiff to "job protection under the FMLA for the dates listed above (see 'beginning on' and 'ending on')." *Id.* Plaintiff's medical provider completed the medical certification form on August 27, 2020. *See* Dkt. 39-9 at 9–10.

## II.   PROCEDURAL HISTORY

Approximately one month after he was terminated, Plaintiff filed a charge of discrimination (the "Charge") with the Equal Employment Opportunity Commission (the "EEOC") against WinCo, asserting that WinCo terminated Plaintiff's employment in violation of the ADA and the TLC. *See* Dkt. 12.

The following month, on October 15, 2020, Plaintiff commenced this lawsuit against Defendants. *See* Dkt. 1. On December 18, 2020, Plaintiff amended his complaint (the "First

---

[6] In addition, the record includes evidence that Plaintiff sought short-term disability benefits in connection with his COVID-19 diagnosis. *See* Dkt. 39-9 at 1. Plaintiff's application for short term disability benefits is not relevant to the issues raised in the parties' summary judgment briefing.

Amended Complaint") with the consent of Defendants. *See* Dkts. 11–12. The parties filed a Joint Stipulation (Dkt. 12) that the First Amended Complaint includes the "disability discrimination and retaliation claims encompassed by the Charge . . . so that the parties can avoid piecemeal litigation." *See* Dkt. 12 at 1. Also per the Joint Stipulation, Plaintiff agreed to dismiss the Charge. *Id.* at 2.

On November 22, 2021, Defendants filed the present Motion for Summary Judgment. *See* Dkt. 35. Plaintiff filed a response in opposition to the Motion on December 17, 2021, and Defendants filed a reply on January 7, 2022. *See* Dkts. 39, 43. On January 14, 2022, Plaintiff filed a sur-reply. *See* Dkt. 47. Both parties were granted leave to exceed the page limits for briefing and exhibits, which has resulted in a lengthy summary judgment record. The Court held a hearing on the Motion on March 23, 2022. *See* Dkt. 57.

### III.    LEGAL STANDARD

Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999). The appropriate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). In sustaining this burden, the movant must identify "those portions of pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, "need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The movant's burden is only to point out the absence of evidence supporting the nonmoving party's case. *Stults v. Conoco, Inc.*, 76 F.3d 651, 656 (5th Cir. 1996).

In response, the nonmovant "may not rest upon mere allegations contained in the pleadings, but must set forth and support by summary judgment evidence specific facts showing the existence of a genuine issue for trial." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Anderson*, 477 U.S. at 255–57). Once the moving party makes a properly supported motion for summary judgment, the nonmoving party must look beyond the pleadings and designate specific facts in the record to show there is a genuine issue for trial. *Stults*, 76 F.3d at 656. The citations to evidence must be specific, as the district court is not required to "scour the record" to determine whether the evidence raises a genuine issue of material fact. LOCAL R. CV-56(c). Neither "conclusory allegations" nor "unsubstantiated assertions" will satisfy the nonmovant's burden. *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. *Evans v. Tex. Dep't of Transp.*, 547 F. Supp. 2d 626, 636 (E.D. Tex. 2007) (first citing *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); then citing *Celotex Corp.*, 477 U.S. at 322), *aff'd*, 273 F. App'x 391 (5th Cir. 2008). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 322–23.

# IV.    ANALYSIS

Defendants seek summary judgment on all claims asserted by Plaintiff in the First Amended Complaint. For the reasons discussed below, the Court recommends granting the Motion.

## A.  Plaintiff's ADA Retaliation and ADA Interference Claims against WinCo

WinCo argues it is entitled to summary judgment on Plaintiff's ADA claims. *See* Dkt. 35 at 48–51. As a preliminary matter, the parties disagree as to the type of ADA claims Plaintiff has asserted in this lawsuit. *Compare* Dkt. 35 at 51 (WinCo's initial argument that Plaintiff "does not appear to bring any claims under Section 12203(b)") *with* Dkt. 39 at 49–51 (Plaintiff's response containing arguments under both Section 12203(a) and Section 12203(b)).

> In relevant part, Plaintiff's First Amended Complaint asserts:
>
> For his second cause of action, Plaintiff would show that Win[C]o subjected Plaintiff to discrimination on the ground of his opposition to conduct in violation of the ADA and the TLC, constituting retaliation under the ADA and TLC, and that Win[C]o is accordingly entitled to recover actual damages, compensatory damages, punitive damages, prejudgment interest, attorney's fees and costs.

*See* Dkt. 11 at 5–6; *see also id.* at 4 ("Prior to the filing of this Complaint, Plaintiff filed a charge of discrimination alleging retaliation claims in violation of the ADA and the TLC."). WinCo characterizes the above language as solely raising an ADA retaliation claim because it closely tracks that of the ADA's anti-retaliation provision (hereinafter "Section 12203(a)" or "ADA retaliation"). Section 12203(a) provides:

> **(a) Retaliation**
>
> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. § 12203(a). The Court agrees with WinCo, and Plaintiff does not dispute, that Plaintiff

has asserted an ADA retaliation claim under Section 12203(a). In addition to this ADA retaliation

claim, however, Plaintiff argues in his summary judgment briefing that he has also raised an ADA

claim for improper interference, coercion, or intimidation under 42 U.S.C. § 12203(b) (hereinafter

"Section 12203(b)" or "ADA interference"). *See* Dkt. 39 at 49, 51. Section 12203(b) provides:

> **(b) Interference, coercion, or intimidation**
>
> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual
> in the exercise or enjoyment of, or on account of his or her having exercised or
> enjoyed, or on account of his or her having aided or encouraged any other individual
> in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(b). Although Plaintiff did not explicitly reference Section 12203(b) in his First

Amended Complaint, Plaintiff alleged therein that he "became aware of health concerns among

employees . . . in light of the COVID-19 pandemic, including the need for accommodation of the

actual disability, record of disability or perceived disability of multiple employees . . . ," that he

"raised issues with [WinCo's management, including] Miller . . . and Reilly . . . concerning [the

employees'] treatment, and specifically concerning the necessity to accommodate requests for

leave . . . ," and that "Miller retaliated against him, including by criticizing his standing up for his

employees." *See* Dkt. 11 at 2–3. The Court finds these allegations are sufficient to state an ADA

interference claim under Section 12203(b). The Court will therefore address the parties' summary

judgment arguments under Section 12203(a) and Section 12203(b).

### 1. Plaintiff's ADA Retaliation Claim

"When a plaintiff presents indirect evidence of unlawful retaliation under the ADA, we

apply the burden shifting scheme established in *McDonnell Douglas Corp. v. Green*."[7] *Lyons v.*

*Katy Indep. Sch. Dist.*, 964 F.3d 298, 304 (5th Cir. 2020) (citing *McDonnell*, 411 U.S. 792, 802–

---

[7] Plaintiff does not contend he has direct evidence to support his ADA claims.

04 (1973)). First, to establish a prima facie case of retaliation under the ADA, the plaintiff must show that (1) he "engaged in an activity protected by the ADA," (2) he "suffered an adverse employment action," and (3) "there is a causal connection between the protected activity and the adverse action." *Id.* If the employee establishes a prima facie case of retaliation, the burden shifts to the employer to demonstrate that it had a "legitimate, nondiscriminatory reason" for the adverse action. *Id.* "If the employer meets its burden of production, the employee must then demonstrate that the proffered reason is a pretext for retaliation." *Id.* "Ultimately, the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred." *Id.*

The Court recommends finding that Plaintiff has failed to make a prima facie showing of unlawful retaliation under the ADA. While there is no dispute that Plaintiff's termination constitutes an adverse employment action, Plaintiff fails to establish the remaining two elements of a prima facie case, namely that he engaged in protected activity or that there was a causal connection between protected activity and the adverse employment action.

Protected activity in the ADA retaliation context means "opposing any act or practice made unlawful by the ADA." *See St. John v. Sirius Sols., LLLP*, 299 F. App'x 308, 309 (5th Cir. 2008) (cleaned up); *see also DeBlanc v. St. Tammany Par. Sch. Bd.*, 640 F. App'x 308, 313 (5th Cir. 2016). In this regard, Plaintiff must show that "he had a reasonable belief that the employer was engaged in unlawful employment practices." *See St. John*, 299 F. App'x at 309; *DeBlanc*, 640 F. App'x at 313. "In other words, [Plaintiff] must have reasonably believed that [WinCo's] actions were unlawful *under the ADA* in order to have engaged in a 'protected' activity for purposes of establishing a prima facie case of retaliation." *Id.*

Plaintiff argues he engaged in protected activity "between March and August 2020 . . . [by] advocating for [the] rights of employees . . . under the ADA." *See* Dkt. 39 at 49. The Court

disagrees that Plaintiff's advocacy constitutes protected activity for purposes of his ADA retaliation claim. Plaintiff's alleged advocacy was for a group of individuals to which the ADA did not apply—i.e., store employees who did not have a disability within the meaning of the ADA, but, rather, were afraid of a potential future disability if they contracted COVID-19. There is no evidence in the record showing that these individuals had a disability, record of disability, or were regarded as having a disability such that ADA protections would be triggered. Nor does Plaintiff point to any authority supporting the notion that an employer violates the ADA if it fails to extend ADA protections to a possible future disability. *See Hice v. Mazzella Lifting Techs., Inc.*, No. 2:21-cv-281, 2022 WL 636640, at *7 (E.D. Va. Mar. 4, 2022) ("[P]ossible future exposure to COVID-19 does not constitute an impairment under the ADA."); *Parker v. Cenlar FSB*, No. 20-cv-02175, 2021 WL 22828, at *6 (E.D. Pa. Jan. 4, 2021) (finding that "possible *exposure* to COVID-19" is not an impairment under the ADA because it "is not a physical or mental impairment that substantially limits one or more major life activities") (internal citation and quotation marks omitted); *cf. Equal Emp. Opportunity Comm'n v. STME, LLC*, 938 F.3d 1305, 1315 (11th Cir. 2019) (holding, in the context of a case involving an employee who had a potential risk of contracting Ebola virus during future foreign travel, that "the disability definition in the ADA does not cover this case where an employer perceives a person to be presently healthy with only a potential to become ill and disabled in the future"). As such, Plaintiff could not have harbored a reasonable belief that WinCo engaged in unlawful employment practices under the ADA with respect to the store employees at issue. Viewing the evidence in the light most favorable to Plaintiff, a jury could not conclude that Plaintiff engaged in protected activity when Plaintiff voiced employee concerns regarding possible future exposure to COVID-19 and advocated for personal leaves of absence to minimize the risk of exposure.

Moreover, as Plaintiff himself acknowledges, Plaintiff's phone conversations with Miller and Reilly in March 2020 did not constitute protected activity because the calls did not address WinCo's ADA-related employment practices. *See Yount v. S & A Rest. Corp.*, 2000 WL 1029010, at *3 (5th Cir. 2000) (holding "the employee's statement of opposition *must* refer to an 'allegedly unlawful' employment practice"). Plaintiff's conversation with Miller consisted of Plaintiff voicing employee concerns regarding working during the COVID-19 pandemic, and informing Miller that specific produce department employees planned to take leave because they did not feel safe working. *See* Dkt 35-1 at 47–48, 51, 61. Although Plaintiff believed that Miller was abrasive in his initial response to Plaintiff, Plaintiff does not argue that Miller's conduct during the phone call amounted to a violation of the ADA. Notably, Plaintiff admitted in his deposition that he never spoke with Miller regarding the ADA and further, that the produce department employees were not seeking ADA leave or "claiming they needed leave as an accommodation for a disability." *Id.* at 63–64 ("They [the store employees] did not ask for ADA or FMLA leave."); *see also id.* at 64 ("We did not discuss ADA leave or FMLA."). Likewise, Plaintiff did not discuss the ADA or WinCo's ADA-related employment practices during his conversation with Reilly. *Id.* at 64, 66. Rather, Plaintiff's conversation with Reilly revolved around Plaintiff expressing concerns regarding Miller, and informing Reilly that employees wanted to take "leave because they're scared of getting sick." *See id.* at 66. Ultimately, the fact that Plaintiff did not raise the ADA during his conversations with Miller and Reilly suggests he did not have a reasonable belief that WinCo was engaged in unlawful employment practices under the ADA. *See St. John*, 299 F. App'x at 309 (emails did not constitute protected activity because they complained of conduct that was not protected under the ADA).

Finally, Plaintiff argues that his August 2020 request for leave through FMLASource constitutes protected activity because it was a request for accommodation due to his COVID-19 diagnosis. *See* Dkt. 39 at 49. Plaintiff's argument goes one step further. He also contends that his August 2020 leave request "constituted notice of his own disability" due to COVID-19. *Id.* Both of these arguments fail.

"[M]aking a request for a reasonable accommodation under the ADA may constitute engaging in a protected activity." *See Tabatchnik v. Cont'l Airlines*, 262 F. App'x 674, 676 (5th Cir. 2008). Here, however, there is no evidence that Plaintiff, at any point, sought an accommodation under the ADA. Although Plaintiff attempts to cast his August 2020 leave request as a request for ADA accommodation, the undisputed evidence is that this leave request sought leave solely under the FMLA. *See* Dkt. 39-9 (Plaintiff's leave request paperwork and declaration confirming that he applied for FMLA leave for the work days missed due to COVID-19). The Fifth Circuit has unequivocally held that "a request for FMLA leave is not a request for a reasonable accommodation under the ADA." *Acker v. Gen. Motors, LLC*, 853 F.3d 784, 791 (5th Cir. 2017); *see also id.* ("FMLA leave is not a reasonable accommodation under the ADA; rather it is a right enforceable under a separate statutory provision." (quoting *Harville v. Tex. A&M Univ.*, 833 F. Supp. 2d 645, 661 (S.D. Tex. 2011))). But even if Plaintiff's August 2020 leave request sought relief under the ADA on account of Plaintiff's COVID-19 diagnosis, Plaintiff's argument fails because he has not presented evidence to create a genuine dispute of material fact as to whether his COVID-19 diagnosis constituted an impairment under the ADA. That is, Plaintiff has failed to present a triable issue as to whether he had "(A) a physical or mental impairment that substantially limit[ed] one or more major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." *See* 42 U.S.C. § 12102(1); *Williams v. Tarrant Cnty.*

*Coll. Dist.*, 717 F. App'x 440, 447 (5th Cir. 2018) (On summary judgment, the Court must consider whether there is "evidence sufficient to demonstrate a genuine dispute of material fact for both the actual-disability and regarded-as standards."). Plaintiff does not allege, nor is there any evidence demonstrating, that his COVID-19 symptoms—loss of taste or smell followed by nausea and fever for a few days—substantially limited any of his major life activities. *See Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 655 (5th Cir. 2003) ("Major life activities" are "those activities that are of central importance to daily life."); *see also Hale v. King*, 642 F.3d 492, 500 (5th Cir. 2011) ("[T]o be substantially limited means to be unable to perform a major life activity that the average person in the general population can perform, or to be significantly restricted in the ability to perform it."). In addition, because Plaintiff testified that he no longer had symptoms after his fever resolved, Plaintiff's COVID-19 impairment was transitory in nature and would not meet the "regarded as" standard. *See* 42 U.S.C. § 12102(3)(A) (Under the 2008 amendments to the ADA, an individual is "regarded as" disabled when she is perceived as having a physical or mental impairment, regardless of whether the impairment actually exists or is perceived to limit a major life activity.); *see id.* § 12102(3)(B) (An individual cannot be "regarded as having such an impairment," however, if the impairment is "transitory and minor" and defining a transitory impairment as "an impairment with an actual or expected duration of 6 months or less.").

In sum, Plaintiff has not demonstrated that he engaged in protected activity for purposes of establishing a prima facie case of unlawful ADA retaliation. But even if Plaintiff's alleged advocacy for his store employees or his conversations with Miller and Reilly constituted protected activity, Plaintiff fails to show a genuine issue of material fact as to a causal connection between such activity and his termination. "To demonstrate the third element of a prima facie case of retaliation—a causal connection between the protected activity and the adverse action—a plaintiff

must demonstrate that the employer's decision was based in part on knowledge of the employee's protected activity." *Lyons*, 964 F.3d at 305 (internal quotation marks and citation omitted). Plaintiff presents no evidence connecting his alleged protected activity with his termination. Though Plaintiff argues WinCo terminated him due to his advocacy efforts, Plaintiff does not point to any evidence demonstrating that Miller terminated Plaintiff based on his knowledge of Plaintiff's advocacy efforts. In fact, the evidence presented shows that WinCo responded positively to Plaintiff's advocacy efforts: Plaintiff testified that Reilly listened to his concerns and encouraged Plaintiff to take leave if he needed it. Likewise, although Plaintiff considered Miller's initial reaction to be abrasive, Plaintiff readily admitted that Miller was thereafter supportive of Plaintiff's concerns and encouraged store employees, including Plaintiff, to take leave as necessary. *See* Dkt. 35-1 at 88 ("[H]e seemed supportive of everything after that initial call and me calling Jim Reilly. He was supportive of everybody."). Plaintiff also testified during his deposition that prior to his termination, he never experienced or witnessed any conduct that he believed to be retaliatory. *See* Dkt. 35-1 at 25. Plaintiff's own testimony thus undercuts any argument for causation. *See Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 589 (5th Cir. 2020) ("What matters is that Clark doesn't connect his alleged 'protected activity' . . . to his superiors' desire for him to leave. . . . Even if Clark's superiors were out to get him because of his handling of overtime, or for some other undisclosed reason, he presented no evidence connecting his internal complaint to his termination.").

Accordingly, the Court recommends granting summary judgment in favor of WinCo as to Plaintiff's ADA retaliation claim due to Plaintiff's failure to establish a prima facie case.

### 2. Plaintiff's ADA Interference Claim

The ADA's interference provision, Section 12203(b), prohibits three categories of conduct: (1) interference "with any individual in the exercise or enjoyment of" an ADA right, (2) interference "with any individual . . . on account of his or her having exercised or enjoyed" an ADA right, and (3) interference "with any individual . . . on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of" an ADA right. *See* § 12203(b); *see also Huber v. Blue Cross & Blue Shield of Fla., Inc.*, No. 20-cv-3059, 2021 WL 1023052, at *4 (E.D. La. Mar. 17, 2021). Plaintiff raises arguments under the first and third categories. *See* Dkt. 39 at 51 (Plaintiff's argument in his summary judgment briefing that WinCo threatened, coerced, interfered, or intimidated Plaintiff due to his having aided or encouraged subordinates to exercise ADA rights); *id.* at 52 (raising argument that he exercised an ADA right for himself). Specifically, Plaintiff contends that WinCo unlawfully interfered with his "exercise of an ADA right for himself" and his attempt to assist and encourage store employees in exercising rights protected under the ADA. *Id.* This claim necessarily fails for reasons similar to those already discussed above. Plaintiff has not presented a genuine issue of material fact that his COVID-19 diagnosis constituted a disability under the ADA. There is also no record evidence that any of the store employees for whom Plaintiff advocated had a disability, record of disability, or were regarded as disabled such that they could exercise ADA-protected rights. Nor could the store employees seek relief under the ADA for their fear of a possible future disability. *See Hice*, 2022 WL 636640, at *7 ("[P]ossible future exposure to COVID-19 does not constitute an impairment under the ADA."). As such, Plaintiff was not "aid[ing] or encourag[ing] any other individual in the exercise or enjoyment of" an ADA right. *See* § 12203(b); *see, e.g.*, *STME, LLC*, 938 F.3d at 1321 ("The problem with the EEOC's interference claim, however, is that, when Massage Envy

fired Lowe, she had no existing rights under the ADA. Of course, Lowe was not actually disabled by Ebola and thus had no right to a reasonable accommodation under the ADA. . . . Because Lowe had no rights under the ADA, Massage Envy could not and did not interfere with her exercise or enjoyment of those rights."). The Court therefore recommends granting summary judgment in favor of WinCo on Plaintiff's ADA interference claim.

### B. Plaintiff's Retaliation Claim under the TLC

As set forth in his First Amended Complaint, Plaintiff's retaliation claim under the TLC arises from the same facts as his ADA retaliation claim. *See* Dkt. 11 at 4 ("Win[C]o had an intent to retaliate against Plaintiff in violation of the ADA and the TLC."); *id.* at 5 ("For his second cause of action, Plaintiff would show that Win[C]o subjected Plaintiff to discrimination on the ground of his opposition to conduct in violation of the ADA and the TLC, constituting retaliation under the ADA and TLC . . . ."). In his briefing, Plaintiff represents that his TLC claim is brought pursuant to Section 21.055 of the TLC. *See* Dkt. 39 at 49. The briefing addresses Plaintiff's ADA retaliation and TLC retaliation claims together. *See id.* at 49–53; *see also* Dkt. 35 at 48–51.

Section 21.055 of the TLC provides in relevant part that an employer "commits an unlawful employment practice if the employer . . . retaliates or discriminates against a person who . . . opposes a discriminatory practice." *See* TEX. LAB. CODE § 21.055(1). "The sections of the TLC addressing discrimination in employment were passed as part of the Texas Commission on Human Rights Act (TCHRA)." *Stephens v. Big Spring Herald, Inc.*, No. 1:19-cv-123, 2021 WL 3030064, at *4 (N.D. Tex. Mar. 29, 2021) (citing *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999)). Because the TCHRA "parallels the language of the ADA, Texas courts follow ADA law in evaluating TCHRA discrimination claims." *Williams*, 717 F. App'x at 444–45 (cleaned up): *see also Stephens*, 2021 WL 3030064, at *4 (finding that because "[t]he Texas Legislature modeled

the TCHRA after federal civil-rights law, . . . Texas courts look to federal precedent with respect to the ADA when analyzing disability discrimination in employment.") (citing *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 473–74 (5th Cir. 2006)). The Court's analysis of Plaintiff's ADA retaliation claim therefore applies equally to Plaintiff's TLC claim. *Id.*; *Gober v. Frankel Fam. Tr.*, 537 F. App'x 518, 520 (5th Cir. 2013) ("[W]e consider these [ADA and TCHRA] claims together and apply the legal standards for the ADA to analyze both claims."); *see, e.g.*, *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 348 (5th Cir. 2019) (conducting a single analysis under the ADA to evaluate the plaintiff's TCHRA and ADA retaliation claims). Therefore, because the Court has recommended summary judgment in favor of WinCo as to Plaintiff's ADA retaliation claim, the Court likewise recommends summary judgment in favor of WinCo as to Plaintiff's TLC retaliation claim.

### C.  Plaintiff's FMLA Claims against Defendants

"The FMLA was enacted to permit employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." *Elsensohn v. St. Tammany Par. Sheriff's Off.*, 530 F.3d 368, 372 (5th Cir. 2008). "The FMLA creates two types of protections – entitlement rights (sometimes also called prescriptive rights) and proscriptive rights." *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 526 (5th Cir. 2021). The FMLA's prescriptive rights create a series of substantive rights, *see Elsensohn*, 530 F.3d at 372, which include namely, the right of an eligible employee "to take up to twelve weeks of leave in any one-year period to address a family member's or the employee's own serious health condition." *Bryant v. Tex. Dep't of Aging & Disability Servs.*, 781 F.3d 764, 768 (5th Cir. 2015); *see also Price v. Int'l Paper Co.*, 2022 WL 729430, at *2 (5th Cir. Mar. 10, 2022). "An employee's right to return to the same position after a qualified absence [also] falls under this

category." *Mauder v. Metro. Transit Auth. of Harris Cnty., Tex.*, 446 F.3d 574, 580 (5th Cir. 2006); *see also Haley v. All. Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004). More specifically, under 29 U.S.C. § 2614 (hereinafter, "Section 2614"), "[u]pon an employee's return from a qualified leave, employers must restore the employee to either 'the position of employment held by the employee when the leave commenced' or 'an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.'" *Amedee v. Shell Chem., L.P.*, 953 F.3d 831, 834 (5th Cir. 2020).

Claims for violations of the above prescriptive rights are brought under 29 U.S.C. § 2615(a)(1), which makes it unlawful for an employer to interfere with, restrain, or deny the exercise or attempted exercise of FMLA rights. *See Haley*, 391 F.3d at 649; *see also Amedee*, 953 F.3d at 834–35 (providing that "[c]laims for failure to restore are also known as entitlement claims and are brought under § 2615(a)(1).").

The second set of provisions in the FMLA are proscriptive in nature and "bar employers from penalizing employees and other individuals for exercising their rights." *Elsensohn*, 530 F.3d at 372. Claims for violations of these proscriptive rights are brought under 29 U.S.C. § 2615(a)(2), which makes it unlawful "for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" under the FMLA. *See* 29 U.S.C. § 2615(a)(2); *Haley*, 391 F.3d at 649 ("The proscriptive FMLA rights include an employee's right not to be discriminated or retaliated against for having exercised the right to take FMLA leave.").

"Ordinarily, cases seeking to enforce proscriptive rights are brought by the employees who were discriminated against under [Section] 2615(a)(2)." *Elsensohn*, 530 F.3d at 372. In addition, however, there is a "different, less often discussed section," *id.*, which is set forth in 29 U.S.C. § 2615(b). Section 2615(b) makes it unlawful for an employer to:

discharge or in any other manner discriminate against any individual because such individual--

> (1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter;
> (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or
> (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter.

29 U.S.C. § 2615(b).

Plaintiff's First Amended Complaint asserts Defendants violated his prescriptive and proscriptive rights under the FMLA, citing to Section 2615(a)(1) and Section 2615(a)(2). *See* Dkt. 11 at 5. In addition, Plaintiff asserts Defendants violated Section 2615(b). *Id.* Plaintiff specifically alleges:

> In retaliating against Plaintiff on account of his complaints, on behalf of employees in the Store, in light of the COVID-19 pandemic, relating to the appropriateness of intermittent or full leave under the FMLA for such employees in light of serious medical conditions of themselves or their family, Defendants violated Section 2615(a)(1) and (2) and (b) in that they thereby interfered with, restrained or denied the exercise, or discharged or in any other manner discriminated against Plaintiff for opposing a practice made unlawful by the FMLA or because such Plaintiff instituted or caused to be instituted a proceeding related to the FMLA.
> . . . .
> In terminating Plaintiff under the circumstances they did, Defendants violated Section 2615(a)(1) and (2) and (b) in that they thereby interfered with, restrained or denied the exercise, or Plaintiff's attempt to exercise, the right to FMLA leave, or discharged or in any other manner discriminated against Plaintiff for opposing a practice made unlawful by the FMLA or because such individual, in seeking such leave, instituted or caused to be instituted a proceeding related to the FMLA.

In addition to his claims under Sections 2615(a)(1), 2615(a)(2), and 2615(b), the First Amended Complaint raises a failure-to-restore claim under Section 2614. *See* Dkt. 11 at 5. As to this claim, Plaintiff alleges:

> In terminating Plaintiff on return from an FMLA leave, Defendants violated Section 2614(a)(1)(A) and (B) and 2614(a)(2) by failing to restore Plaintiff to the position of employment held by Plaintiff when the leave commenced or an equivalent

position with equivalent employment benefits, pay, and other terms and conditions of employment.

*Id.* Defendants seek summary judgment on all of Plaintiff's FMLA claims, each of which the Court will address in turn.

### 1. Plaintiff's FMLA Interference Claim

To establish a prima facie case of interference under Section 2615(a)(1) of the FMLA, Plaintiff must show: "(1) he was an eligible employee; (2) his employer was subject to FMLA requirements; (3) he was entitled to leave; (4) he gave proper notice of his intention to take FMLA leave; and (5) his employer denied him the benefits to which he was entitled under the FMLA." *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017). If the plaintiff makes out a prima facie case, the burden shifts to his or her employer to articulate a legitimate non-retaliatory reason for the employment action at issue. *Id.* If the employer does so, the burden shifts back to the plaintiff, who must raise an issue of material fact that the employer's proffered reason was pretextual. *Id.* Here, Defendants argue they are entitled to summary judgment because Plaintiff is unable to establish a prima facie case of FMLA interference under "the first, third, fourth, or fifth elements." *See* Dkt. 35 at 33. The Court's analysis focuses on the third and fifth elements of the prima facie case.

The Court initially finds that Plaintiff has failed to establish a genuine issue of material fact as to the third element—whether he was entitled to leave under the FMLA. *See Harrelson v. Lufkin Indus., Inc.*, 614 F. App'x 761, 763 (5th Cir. 2015). "As part of this showing, [Plaintiff] must present evidence of a 'serious health condition' . . . ." *See id.* Defendants argue that Plaintiff has failed to demonstrate that his COVID-19 diagnosis was a "serious health condition" under the FMLA, such that he was qualified to take FMLA leave. *See* Dkt. 35 at 33–36 (arguing Plaintiff has not shown that his leave was FMLA-qualifying because his COVID-19 diagnosis was not a

34

serious health condition). The Court agrees. To qualify for FMLA leave, a plaintiff must have suffered a "serious health condition that makes the employee unable to perform the functions of [his] position." *See* 29 U.S.C. § 2612(a)(1)(D). For purposes of the FMLA, a "serious health condition entitling an employee to FMLA leave means an illness, injury, impairment or physical or mental condition that involves inpatient care as defined in § 825.114 or continuing treatment by a health care provider as defined in § 825.115." *See* 29 C.F.R. § 825.113. "Inpatient care" is defined in the regulations as "an overnight stay in a hospital, hospice, or residential medical care facility, including any period of incapacity as defined in § 825.113(b), or any subsequent treatment in connection with such inpatient care." *Id.* § 825.114. Here, there is no record evidence of Plaintiff having received inpatient care. Thus, the Court must consider whether there is evidence in the summary judgment record of Plaintiff receiving "continuing treatment by a healthcare provider as defined in § 825.115." *Id.* § 825.113.

The regulations recognize five categories of serious health conditions involving "continuing treatment." *Id.* § 825.115 ("A serious health condition involving continuing treatment by a health care provider includes any of the following:" (a) incapacity and treatment; (b) pregnancy or prenatal care; (c) chronic conditions; (d) permanent or long-term conditions; and (e) conditions requiring multiple treatments.). Only one category is applicable here: conditions involving a period of incapacity of more than three consecutive days and treatment. *Id.* § 825.115(a). To qualify under this category, the plaintiff must show:

> (a) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:
>
> > (1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or

by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

*Id.* The term "treatment"

includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations. A regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen). A regimen of continuing treatment that includes the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave.

29 C.F.R. § 825.113.

Plaintiff's medical records show that he saw a medical provider twice in connection with his COVID-19 diagnosis. *See* Dkt. 35-10. Plaintiff's initial visit was on August 3, 2020, when he tested positive for COVID-19 after presenting with symptoms of loss of taste and smell. *Id.* at 10, 30–31. Plaintiff was instructed by his provider to self-isolate, take over-the-counter medications such as Tylenol, and to drink fluids. *Id.* at 10. This first visit did not "result[] in a regimen of continuing treatment under the supervision of the health care provider" because Plaintiff was only told to take over-the-counter medications and fluids. *See* § 825.113 ("A regimen of continuing treatment that includes the taking of over-the-counter medications . . . [or] drinking fluids . . . is not, by itself, sufficient to constitute a regiment of continuing treatment."). Plaintiff's second visit, on August 16, 2020, was a virtual appointment to seek authorization to return to work—not to receive a medical examination or treatment. *See* Dkt. 35-10 at 6 (seen during "virtual encounter" and authorized to "return to work on 8/17/2020" because "[n]ow [s]ymptom [f]ree for more than

72 hours"). Under the applicable regulations, treatment by a health care provider means an in-person visit. *See* 29 C.F.R. § 825.115(a)(3). Even if the Court were to relax this requirement in light of the unique circumstances present during the COVID-19 pandemic, Plaintiff's virtual visit on August 16, 2020, still would not qualify as continuing treatment because Plaintiff's symptoms had resolved by that date and the sole purpose of the visit was to seek authorization to return to work. Accordingly, Plaintiff has not presented evidence showing that his COVID-19 diagnosis was a "serious health condition involving continuing treatment by a health care provider." *Id.* § 825.115.

Plaintiff suggests that the highly communicable nature of COVID-19 and the mandatory quarantine restrictions with which he was required to comply are important factors to consider in deciding whether his COVID-19 diagnosis amounted to a serious health condition. *See* Dkt. 39 at 27; Dkt. 35-10 at 31 (health care provider's directive to Plaintiff that he self-isolate for ten days from the date of exposure or onset of symptoms after Plaintiff tested positive for COVID-19); Dkt. 35-3 at 29 (Miller's directive to Plaintiff that he would have to quarantine until his wife's COVID-19 test results were available). The Court is not persuaded by Plaintiff's argument. The few cases to have addressed this issue, thus far, have found that quarantining due to COVID-19, by itself, does not constitute "continuing treatment" under the applicable regulations. *See, e.g.*, *Mays v. RHA Health Servs., LLC*, No. 1:21-cv-1077, 2021 WL 3909674, at *3 (W.D. Tenn. Aug. 31, 2021) ("Plaintiff's claim that quarantining constitutes a 'regimen of continuing treatment' is not supported by the relevant regulation which makes clear that 'activities that can be initiated without a visit to a health care provider' are not, by themselves sufficient to constitute a regimen of continuing treatment. *See* § 825.113. The act of quarantining can obviously be initiated without an in-person visit to a health care provider, and indeed, sometimes should be. Plaintiff does not

suggest that she was prescribed a regimen of treatment or therapy rising above, for instance, bed-rest, or taking over-the-counter medications."); *Anzalone v. United Bank*, No. 1:21-cv-14, 2021 WL 4759633, at *5 (S.D. Ala. Oct. 8, 2021) ("Anzalone claims he was told by a health care provider to quarantine, which is not specifically mentioned in the regulations, but could be argued is a type of regimen to address a virus like COVID-19. Of course, a quarantine can be initiated without a visit to a health care provider and would mean Anzalone's quarantine would not be a regimen of continuing treatment. Anzalone does not claim he was prescribed a regimen of treatment or therapy that was an order of magnitude more serious than a course of over-the-counter medications or bed rest."); *Nuttall v. Progressive Parma Care Ctr., LLC*, No. 1:20-cv-1266, 2021 WL 5920312, at *6 (N.D. Ohio Dec. 15, 2021) ("While an order to isolate or quarantine with respect to COVID-19 may seemingly appear to qualify as an instance intended for protection by the FMLA, the U.S. Department of Labor has clearly stated that currently, federal law generally does not require employers to provide paid leave to employees who are absent from work because they are sick with COVID-19, have been exposed to someone with COVID-19, or are caring for someone with COVID-19.") (internal quotation marks and citation omitted); *Willis v. Coca Cola Enters., Inc.*, 445 F.3d 413, 417 (5th Cir. 2006) (addressing employee's claim she was placed on "involuntary leave" when her supervisor refused to permit her to return to work until she had gotten a medical release, and holding that while "it is not contrary to the FMLA for an employee to be placed on involuntary FMLA leave," the employee must have a serious health condition in order for FMLA protections to be triggered). Based on the undisputed facts presented in this case, Plaintiff has failed to present a genuine issue of material fact as to the third element.

Aside from the third element, the Court further concludes that Plaintiff is unable to establish the fifth element of a prima facie FMLA interference case—that WinCo "denied him the

38

benefits to which he was entitled under the FMLA." *Caldwell*, 850 F.3d at 245. Even if the Court were to assume that Plaintiff actually requested FMLA leave prior to his termination, the undisputed evidence is that Plaintiff received all of the requested time off—from July 27, 2020 through August 8, 2020 initially, and then extending until August 17, 2020—without any hindrance by Defendants. Plaintiff does not point to any evidence in the record, or in the texts exchanged between Miller and himself, that would show Defendants interfered with or restrained his exercise or attempt to exercise his right to leave during this time period. *See Acker*, 853 F.3d at 788 ("To prove an interference claim, a plaintiff 'must at least show that [the defendant] interfered with, restrained, or denied [his] exercise or attempt to exercise FMLA rights, and that the violation prejudiced [him].'"). Rather, the evidence only shows that Miller readily gave Plaintiff the time off that Plaintiff requested. Thus, in the absence of any record evidence showing 'interference' on the part of Defendants, Plaintiff is unable to establish a prima facie case. *See, e.g.*, *Williams v. City of Port Arthur*, No: 1:20-cv-527, 2022 WL 1183293, at *12 (E.D. Tex. Feb. 5, 2022) (finding the plaintiff was unable to establish fifth element of a prima facie FMLA interference claim because "the City didn't deny [the plaintiff] any FMLA leave to which she was entitled" and "while [her supervisor] was irritated at the amount [the plaintiff] had taken, she never prevented her from taking it"); *Wilson v. L&B Realty Advisors, LLP*, No. 3:20-cv-2059, 2022 WL 102564, at *16 (N.D. Tex. Jan. 11, 2022) (finding the plaintiff could not satisfy the fifth element of a prima facie FMLA interference claim because he did not "dispute that he was granted all of the leave he requested"); *Mead v. Lattimore Materials Co.*, No. 3:16-cv-079, 2018 WL 807032, at *8 (N.D. Tex. Feb. 9, 2018) ("[I]t is undisputed that all of Mead's FMLA requests were ultimately granted, and he cannot, therefore, demonstrate that he was denied an entitlement or was prejudiced

under the FMLA."). Accordingly, the Court recommends finding that Defendants are entitled to summary judgment as to Plaintiff's FMLA interference claim.

### 2. Plaintiff's FMLA Failure-to-Restore Claim

The Court next considers Plaintiff's claim that Defendants violated the FMLA by failing to restore him to the store manager position upon his return to work on August 18, 2020. "An employee generally has the right to be reinstated to his previous position or an equivalent position upon his return from FMLA leave." *Hester v. Bell-Textron, Inc.*, 11 F.4th 301, 306 (5th Cir. 2021) (citing 29 U.S.C. § 2614(a)(1)(A)–(B)). This "right is not unlimited, however." *Shirley v. Precision Castparts Corp.*, 726 F.3d 675, 681 (5th Cir. 2013). The Fifth Circuit recently explained in *Hester*,

> the FMLA does not impose a strict liability standard requiring employers, in all circumstances, to reinstate employees following their FMLA leave. Under the FMLA, an employee is only entitled to those rights to which he would have been entitled had he not taken FMLA leave. Accordingly, an employee claiming a violation of his right to reinstatement must actually be entitled to the position to which he seeks reinstatement.

11 F.4th at 306 (internal citations and quotation marks omitted). As the Fifth Circuit emphasized in *Shirley* and several cases since then, including *Hester*, "denying reinstatement to an employee whose right to restored employment had *already been extinguished*—for legitimate reasons unrelated to his efforts to secure FMLA leave—does not violate the [FMLA]." *Shirley*, 726 F.3d at 682; *Hester*, 11 F.4th at 306. Thus, an employer may challenge an employee's "right to return to work after a qualified absence . . . by offering evidence that the employee would have lost his position even had he not taken FMLA leave." *Amedee*, 953 F.3d at 836. "[T]he employer has an evidentiary burden on summary judgment to prove that the plaintiff would have lost his position even if he had not taken FMLA leave." *Hester*, 11 F.4th at 307. "If the employer satisfies this burden, then the plaintiff must present evidence sufficient to raise a jury question that [the employer's] stated reason for firing him . . . was pretextual." *Id.*

Plaintiff's failure-to-restore claim fails for the same reason his FMLA interference claim failed—Plaintiff has not shown that he had a serious health condition. But even if Plaintiff had done so, Plaintiff's failure-to-restore claim still does not survive summary judgment because Defendant has presented undisputed evidence that Plaintiff "would have lost his position even had he not taken FMLA leave," *Amedee*, 953 F.3d at 836, and Plaintiff has not presented any evidence "to raise a jury question that [WinCo's] stated reason[s] for firing him . . . was pretextual," *Shirley*, 726 F.3d at 675. Miller and Leibengood's deposition testimony is uncontroverted that the decision to terminate Plaintiff's employment was made in early July 2020, well before Plaintiff contracted COVID-19. Furthermore, the termination decision was made before Plaintiff's text-message exchange with Miller in which he claimed to have given notice of his intent to seek FMLA leave. Plaintiff has not presented any evidence disputing the fact that Miller and Leibengood drafted Plaintiff's termination letter two days before Plaintiff texted Miller to notify him of his wife's COVID-19 symptoms. This was, by all accounts, a case where the "wheels of termination were put in motion before the request for leave." *See Nero v. Indus. Molding Corp.*, 167 F.3d 921, 926 (5th Cir. 1999) ("[W]here the wheels of termination were put in motion before the request for leave, the court finds that the restoration provision should not apply.") (quoting *Tuberville v. Pers. Fin. Corp.*, No. 3:95-cv-150, 1996 WL 407571, at *3 (N.D. Miss. June 5, 1996)).

Plaintiff also has failed to present evidence sufficient to raise a genuine issue of material fact for trial that WinCo's stated reasons for terminating Plaintiff's employment were pretextual. Although Plaintiff attempts to cast a shadow on the termination decision by pointing to Miller's decision to delay relaying the termination decision until both he and Plaintiff returned from their respective vacations, that business decision is insufficient to raise a jury question as to pretext. *See, e.g.*, *Bryant v. Compass Grp. USA, Inc.*, 413 F.3d 471, 478 (5th Cir. 2005) ("Management does

41

not have to make proper decisions, only non-discriminatory ones. Employment discrimination laws are 'not intended to be a vehicle for judicial second-guessing of business decisions, nor . . . to transform the courts into personnel managers.'" (citations omitted)). Plaintiff also does not dispute WinCo's stated reasons for Plaintiff's termination. At a bare minimum, Plaintiff does not dispute that he received the Written Warning in September 2018. Plaintiff also readily admits that he did not comply with Miller's directive to reopen the bulk foods department by July 1, 2020. And while Plaintiff denies asking Scott and Kincaid to provide doctor notes, he does not dispute that he failed to hold an IP meeting for Scott until he was directed to do so by Leibengood in June 2020. These were all reasons WinCo articulated in the Termination Letter as grounds for termination, and Plaintiff has failed to present evidence sufficient to raise a jury question that these reasons were false or unworthy of credence. Ultimately, "[e]mployees cannot immunize themselves from legitimate termination by taking FMLA leave." *Amedee*, 953 F.3d at 836. Because the undisputed evidence shows that Plaintiff's right to restored employment had already been extinguished for legitimate reasons unrelated to his efforts to secure FMLA leave, the Court finds that Defendants are entitled to summary judgment on Plaintiff's failure-to-restore claim.

### 3. Section 2615(a)(2)

Defendants next seek summary judgment on Plaintiff's claim that Defendants retaliated against him for exercising FMLA rights. As the Fifth Circuit stated in *Amedee*, "[r]etaliation claims for exercising FMLA rights are subject to the *McDonnell Douglas* burden-shifting framework." 953 F.3d at 835. "To make a prima facie case for retaliation under § 2615(a)(2), a plaintiff must show that: he was protected under the FMLA; (2) he suffered an adverse employment decision; and either (3a) that he was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because he took FMLA leave."

*Elsensohn*, 530 F.3d at 372 (cleaned up). If the plaintiff makes a prima facie case, "the burden shifts to the employer to articulate a legitimate . . . nonretaliatory reason for the termination." *Hester*, 11 F.4th at 305 (quoting *Bocalbos v. Nat'l W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998)). If the employer is able to do so, the burden shifts back to the plaintiff to "show by a preponderance of the evidence that the employer's reason" is a pretext for retaliation. *Id.* The Court agrees with Defendants that Plaintiff is unable to establish a prima facie case because there is no evidence that he engaged in protected activity under the FMLA. *See* Dkt. 35 at 32–36.

Plaintiff argues that he engaged in protected activity under the FMLA because he "actively assisted employees after the COVID-19 pandemic began . . . to take leaves under the FMLA . . . , and otherwise stood up for employees concerning their rights to leave under the FMLA." *See* Dkt. 39 at 45. Though Plaintiff may have encouraged store employees to utilize leave during the pandemic, there is no evidence that Plaintiff "actively assisted" any employee with seeking FMLA leave.[8] Plaintiff testified that he was not involved in administering or deciding FMLA requests, and admitted that the employees for which he advocated were not seeking FMLA or ADA leave. *See supra* at 3, 8. Because the store employees did not formally request FMLA leave or otherwise attempt to exercise their rights under the FMLA, the Court cannot conclude that Plaintiff's advocacy efforts constituted protected activity under the FMLA.

Plaintiff also contends that he engaged in protected activity based on his own request for FMLA leave following his COVID-19 diagnosis. In their summary judgment briefing, Defendants argue that Plaintiff did not engage in any conduct prior to his termination that would have

---

[8] As support for this assertion, Plaintiff relied upon the deposition testimony of Glass. *See* Dkt. 38 at 18, 45. Although Glass testified that Plaintiff was generally supportive of employees taking leave during the COVID-19 pandemic, she stated that she did not know if any employee at Store 126 actually took FMLA or ADA leave during the pandemic. *See* Dkt. 39-8 at 3–4. Accordingly, her testimony does not support Plaintiff's assertion that he actively assisted individuals with taking FMLA leave. Plaintiff also relied on the testimony of Roche. *See* Dkt. 39 at 18–19. Although Roche stated that Plaintiff was "the most vocal when it came to COVID concerns," Roche did not testify that Plaintiff actively assisted employees in seeking FMLA leave. *See* Dkt. 39-5 at 5.

reasonably apprised WinCo of his intention to take FMLA leave. *See* Dkt. 35 at 37. "While the employee has a right to take leave under the FMLA, the employee must give his employer notice of his intention to take leave in order to be entitled to it." *Acker*, 853 F.3d at 788. Plaintiff does not dispute that he did not submit a FMLA request to FMLASource until after he was terminated. *Cf.* *Price v. Ajinomoto Foods N. Am., Inc.*, No. 3:20-cv-00253, 2021 WL 5068530, at *3 (N.D. Miss. Nov. 1, 2021) ("Because the Plaintiff did not attempt to apply for FMLA leave until after the date her employment was terminated, she did not engage in any FMLA-protected activity and she cannot show a causal link between any protected activity and her discharge from employment."). However, Plaintiff maintains that his text communications with Miller after his wife had COVID-19 symptoms were "sufficient to afford Defendant [WinCo] notice of [his] need for FMLA leave prior to his termination." *See* Dkt. 39 at 23; *see also id.* at 30–31. Plaintiff specifically relies on the following text message exchange with Miller on July 27, 2020:

> Plaintiff: "Just got back from the clinic, she [Plaintiff's wife] still has a fever, results could take 5-10 days. As soon as I know anything I'll let you know."

> Miller: "You will have to quarantine until she gets her results back. Also, contact FMLA[Source] for any extended leave you have."

> Plaintiff: Will do. I am waiting to hear back from [assistant store manager] Josh now. [Assistant store manager] Sally is still out on leave and [J]osh['s] baby is due on the 8th, hopefully I'll be good to go back by then.

Dkt. 35-3 at 29. Plaintiff argues that this exchange and specifically, his "will do" response, constituted proper notice of Plaintiff's intention to take FMLA leave. Even assuming that this exchange was sufficient to put WinCo on notice of Plaintiff's request for FMLA leave, Plaintiff still fails to establish a causal link between the text exchange and his termination. Again, there is no evidence controverting the fact that Miller and Leibengood made the decision to terminate Plaintiff's position prior to the text message exchange between Plaintiff and Miller. The record is

devoid of any evidence that Plaintiff's request for FMLA leave played any role in WinCo's decision to terminate his employment. *Elsensohn*, 530 F.3d at 372. Therefore, because Plaintiff is unable to establish a prima facie case of retaliation under the FMLA, the Court recommends summary judgment in favor of Defendants on this claim.

### 4. Plaintiff's FMLA Claim under Section 2615(b)

As a final matter, Defendants seek summary judgment on Plaintiff's FMLA claim under Section 2615(b). Section 2615(b) prohibits persons from interfering with proceedings or inquiries related to the FMLA. The section states, in relevant part, that an employer cannot discriminate against any person because that person has (1) filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter; (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter. *See* § 2615(b)(1)–(3). This lawsuit aside, Plaintiff has not alleged that he instituted or participated in any proceedings affecting his own, or anyone else's, FMLA rights. The Court therefore recommends granting summary judgment in favor of Defendants on this claim.

## V. <u>RECOMMENDATION</u>

Based on the foregoing, the Court recommends granting the Motion (Dkt. 35), entering summary judgment in favor of Defendants as to all claims asserted by Plaintiff in the First Amended Complaint, and dismissing this lawsuit with prejudice.

Within fourteen (14) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. § 636(b)(1)(C).

A party is entitled to *de novo* review by the district court of the findings and conclusions contained in this report only if specific objections are made, and failure to timely file written objections to any proposed findings, conclusions, and recommendations contained in this report shall bar an aggrieved party from appellate review of those factual findings and legal conclusions accepted by the district court, except on grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *Id*.; *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

　　　　**So ORDERED and SIGNED this 6th day of June, 2022.**

_____
KIMBERLY C. PRIEST JOHNSON
UNITED STATES MAGISTRATE JUDGE